Carlos MEZQUITA *v.* STATE of Arkansas

CR 03–00017 125 S.W.3d 161

Supreme Court of Arkansas
Opinion delivered October 16, 2003

*The Rogers Law Firm, P.A.*, by: *Edmundo G. Rogers*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Jeffrey A. Weber*, Ass't Att'y Gen., for appellee.

Aɴɴᴀʙᴇʟʟᴇ Cʟɪɴᴛᴏɴ Iᴍʙᴇʀ, Justice. Appellant Carlos Mezquita, a foreign national from El Salvador, was convicted of rape in a bench trial held in Benton County on March 8, 2002. On appeal, he raises eight points of error. We find no error and affirm.

During the early-morning hours of November 19, 2000, Melissa Frank was the sole clerk on duty in an E-Z Mart convenience store, when a man entered the store and purchased a pack of Trident gum. A short time later, the same man returned and, after complaining about the price of the gum he had previously purchased, he bought a bottle of water before leaving the store. While Ms. Frank was sweeping the outside parking lot, she saw the man drive up to the store and enter a third time. Inside, he asked Ms. Frank to help him find something for an upset stomach. When he could not open the bottle of stomach medicine, Ms. Frank reached for the bottle lid to help, and the man attempted to kiss her. Ms. Frank resisted, at which time he forced her down a hallway to a small bathroom where he forcibly held her down and digitally raped her. Managing to struggle free, Ms. Frank kicked her attacker in the groin; he called her a "bitch" and fled the scene. Ms. Frank ran to the desk where she activated her panic button. She ran to the window and saw the man's vehicle, a blue-green Toyota, pulling out of the parking lot.

When the police arrived, Ms. Frank gave them the license tag of the vehicle, and said that she recognized the man and his vehicle because he had been to E-Z Mart on several prior occasions. Ms. Frank described the attacker as being a little taller than she was, of slender build, in his late teens or early twenties, with dark hair and eyes, Hispanic, and wearing a blue Tyson's "365-days" sweatshirt, a black jacket, dark baggy jeans, and a black Nike swoosh knit cap. Ms. Frank worked with Detective Michael Patten of the Rogers Police Department to create a computer-generated sketch of her attacker.

Detective Patten traced the license tag number Ms. Frank had given to a blue-green Toyota Camry owned by Ana and Carlos Mezquita. Det. Patten also pulled Mr. Mezquita's driver's license photo and noticed the photo bore a strong resemblance to the composite of the rapist. Det. Patten, along with Sergeant Jarod Mason and Patrolmen Nick Fisher and Brad Abercrombie, proceeded to the Mezquita apartment, where they found the Camry parked and Carlos Mezquita at home. The officers informed Mr. Mezquita that he did not have to talk to them and he was not under arrest, but that they would like to discuss his car and license tags. He agreed to speak to them outside to avoid waking his family.

Mr. Mezquita accompanied the four officers to Det. Patten's vehicle because it was very cold outside. Once inside the vehicle, Det. Patten again reminded Mr. Mezquita that he was not under arrest and did not have to speak with them. Mr. Mezquita denied being at the E-Z Mart that morning and claimed to have been home since 12:30 a.m. The officers took a Polaroid photograph of Mr. Mezquita after obtaining his permission, and then asked if they could speak to his wife. He agreed and remained in the patrol car with Fisher while Patten and Mason returned to the apartment. Ana Mezquita invited the officers inside the apartment, where she told them she had been fighting with her husband because he had not come home until 4:10 a.m. While talking with Ana in the living room, Sgt. Mason and Det. Patten noticed a black knit cap with the Nike "Swoosh" symbol on it, lying on a bar counter. On the bar beside the cap was a blue shirt that had a Tyson logo on the front, with the words "Safely Worked 365 Days" around the logo. The officers also noticed a package of Trident gum of the type and color described by the victim.

Det. Patten and Sgt. Mason left the apartment and told Mr. Mezquita he could go back inside. While Det. Patten waited in his car at the apartment complex, Sgt. Mason met with Ms. Frank and showed her a six-photo lineup that included the photograph of Mr. Mezquita. After looking at the photo lineup for a little over a minute, Ms. Frank said something about the clothes being different and was unable to identify Mr. Mezquita; instead, she pointed at a different photo, stating she was "not sure."

Sgt. Mason radioed Det. Patten with this information, at which point Det. Patten returned to Mr. Mezquita's apartment and asked him if he would be willing to come to the police station to answer some more questions. Det. Patten again told Mr. Mezquita that he was not under arrest and did not have to speak to them if he did not want to do so, but Mr. Mezquita agreed to come to the station. When asked if he wanted to follow the police car or ride with police, Mr. Mezquita asked if he could ride with Det. Patten because he could not find his wallet and driver's license. Mr. Mezquita sat in the front passenger seat on the ride to the station. During the ride, Mr. Mezquita disclosed to Det. Patten

that he was from California, and the two men discussed California because Det. Patten had also lived there at one time.[1]

While Mr. Mezquita rode to the station with Det. Patten, Sgt. Mason remained at the apartment and obtained Ana Mezquita's verbal and written consent to search the apartment, where he seized the Tyson shirt, Nike cap, and package of gum, along with a dark jacket and pair of dark pants that were similar to Ms. Frank's description of her attacker's clothing.

At the Rogers Police Department, Mr. Mezquita was interviewed in a Criminal Investigation Division (CID) interview room by Det. Patten. The detective again reminded Mr. Mezquita that he did not have to talk, then had him read and sign a Miranda Rights form that was written in both Spanish and English. During this interview, Mr. Mezquita contradicted his earlier statement and admitted that he had been in the E-Z Mart three times during the early morning. His statement mirrored Ms. Frank's statement in that he said he had purchased gum on the first visit, returned a second time to complain about not being given enough change for the gum and to buy a bottle of water, and then returned the third time to buy a bottle of Pepto-Bismol. His version, however, differed from Ms. Frank's statement in that he claimed to have only kissed Ms. Frank and denied any sexual contact with her. At the conclusion of his statement, Mr. Mezquita was placed under arrest by Det. Patten and transferred to another floor to be booked. Only then did Mr. Mezquita apparently inform police that he was from El Salvador.

Prior to trial, Mr. Mezquita moved to suppress his statements to police and the items seized from his apartment because police had not informed him of his right to contact his consulate pursuant to the Vienna Convention on Consular Relations (VCCR). The defense stipulated that Mr. Mezquita's *Miranda* warnings had been properly given and his constitutional rights had not been violated in either the interrogation or the search of his apartment, except as to his VCCR rights. The trial court held two hearings on the suppression motion. In the first hearing, the trial court determined that the Exclusionary Rule was not the proper

---

[1] In spite of the fact that the State and defense later stipulated that Mr. Mezquita was a foreign national from El Salvador, Mezquita apparently did not inform Det. Patten that he was from anywhere other than California. There is no indication in the record that police knew about Mezquita's nationality until he was booked.

remedy for a VCCR violation, even assuming that Mr. Mezquita was in custody at the time of the interview in the CID room. At the second hearing, the trial court heard testimony on the issue of whether or not Mr. Mezquita had been in custody at the time of the interview, and determined that, because he understood enough English to understand his Miranda rights, and because he had been repeatedly assured by the police that he did not have to speak, was not under arrest, and could leave at any time, Mr. Mezquita was not in custody at the time he made his statements.

At trial, Ms. Frank positively identified Mr. Mezquita as the man who had raped her, stating she was "100 percent" sure it was him. Though the trial court initially expressed concern that Ms. Frank had been unable to identify Mr. Mezquita in the photo array, after questioning Ms. Frank himself, the court allowed the in-court identification to stand. Mr. Mezquita was convicted of rape and was sentenced to twenty years in prison, plus an additional ten years' suspended imposition of sentence. He now appeals, raising eight points of error.

### In-Court Identification

Mr. Mezquita first challenges the victim's in-court identification as violative of his Due Process rights because the victim was unable to identify him in a photographic lineup shortly after the rape; and, then at trial when she positively identified him, she told the trial court that she had first recognized him in a pretrial hearing. Mr. Mezquita asserts that it was this opportunity to view him at the pretrial hearing that impermissibly tainted her in-court identification.

 A pretrial identification violates the Due Process Clause when there are suggestive elements in the identification procedure that make it all but inevitable that the victim will identify one person as the culprit. *Fields v. State*, 349 Ark. 122, 76 S.W.3d 868 (2002). We will not reverse a trial court's ruling on the admissibility of an in-court identification unless the ruling is clearly erroneous under the totality of the circumstances. *Travis v. State*, 328 Ark. 442, 944 S.W.2d 96 (1997). In determining whether an in-court identification is admissible, the court looks first at whether the pretrial identification procedure was unnecessarily suggestive or otherwise constitutionally suspect; and it is the appellant's burden to show that the pretrial identification is suspect. *Id.* Reliability is the linchpin in determining the admissibility

of identification testimony. *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995); *Manson v. Braithwaite*, 432 U.S. 98 (1977). In determining reliability, the following factors are considered: (1) the prior opportunity of the witness to observe the alleged act; (2) the accuracy of the prior description of the accused; (3) any identification of another person prior to the pretrial identification procedure; (4) the level of certainty demonstrated at the confrontation; (5) the failure of the witness to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification procedure. *Fields, supra*; *Kimble v. State*, 331 Ark. 155, 959 S.W.2d 43 (1998). Our court has held that, even when the identification procedure is impermissibly suggestive, the trial court may determine that under the totality of the circumstances the identification was sufficiently reliable for the matter to be submitted to the factfinder, and then it is for the factfinder to decide the weight the identification testimony should be given. *Kimble, supra*.

When Ms. Frank viewed the photograph lineup on the morning following the rape, she did not pick the appellant, who was in position six on the layout, as her attacker. Instead, she pointed to the photograph in position two, but told Sgt. Mason that she was "not sure." (R. 307) When she testified at trial, Ms. Frank identified Mr. Mezquita as her attacker and, after she had been examined by the prosecutor and defense counsel, the following colloquy took place between Ms. Frank and the trial court:

> THE COURT: Well, Ms. Frank, how — how sure are you that this is the person?
>
> MS. FRANK: I'm 100 percent.
>
> THE COURT: Why do you think that you didn't recognize his photograph in that lineup?
>
> MS. FRANK: Honestly, Your Honor, after it happened I went home and I actually fell asleep, and once I woke up I didn't really remember much of it at all — at all, I really didn't, but it's just — it keeps coming back and I — I remember more and more every day, and

THE COURT: a lot of it — I have nightmares about it all the time and I just remember more and more of it.

THE COURT: When did you conclude that that was the person who did it?

Ms. FRANK: I actually saw him I think it was in April of last year. He didn't come up to the front or anything, I saw him sitting in the courtroom at a hearing, and I — I saw him and I knew who he was. I knew it was him, I was positive.

THE COURT: Was the light on in the bathroom?

Ms. FRANK: I think it was.

THE COURT: What about the hallway?

Ms. FRANK: Actually, I didn't think the hallway has a light. I'm not sure.

THE COURT: Well, in the photograph [of the hallway] that was introduced it appears pretty bright.

Ms. FRANK: Yeah.

THE COURT: Is that — is that because the floor is white, the walls are white?

Ms. FRANK: Everything is white, yes.

THE COURT: Okay. All right. I have nothing else.

PROSECUTOR: Nothing further from the State, Your Honor.

DEFENSE COUNSEL: Nothing, Your Honor.

THE COURT: All right, we'll be in recess for about five minutes.

After the short recess, defense counsel immediately objected, stating that Ms. Frank's in-court identification was tainted by her opportunity to view Mr. Mezquita at the pretrial hearing. The State argues that the issue of the in-court identification is not preserved because Mr. Mezquita did not object at the first opportunity, when Ms. Frank had made her first identification of Mr. Mezquita earlier on direct examination. Mr. Mezquita counters that it was not until this colloquy between the trial court and Ms. Frank that he was aware her identification might have been the result of viewing him at the pretrial hearing.

■ ■ The law is well settled that to preserve an issue for appeal, a defendant must object at the first opportunity. *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000). In the case of *Gamble v. State*, 351 Ark. 541, 95 S.W.3d 755 (2003), the prosecutor posed a question to a witness who answered, then the defense counsel objected. On appeal, the State contended that the issue was not preserved for appeal because the defense had not made a contemporaneous objection as soon as the question was asked, but waited until the witness had answered. *Id.* Holding that the issue was preserved, we delineated the difference between a "contemporaneous objection" and "objecting at the first opportunity":

> If a contemporaneous objection is not made at the time the evidence is offered during a jury trial, the proverbial bell will have been rung and the jury prejudiced. However, when the contested evidence is mentioned during a bench trial, there is no risk of prejudice because a trial judge is able to consider evidence only for its proper purpose. [*Stewart v. State*, 332 Ark. 138, 143, 964 S.W.2d 793 (1988).] To preserve a point for appeal, a proper objection *must be asserted at the first opportunity after the matter to which objection has been made occurs.* [citation omitted.] This was done in the present case. There is no merit to the State's argument that the issue was not preserved.

*Gamble v. State*, 351 Ark. at 548-49, 95 S.W.3d at 760.

■ The instant case, like *Gamble*, involved a bench trial. Therefore, it was not necessary for defense counsel to interrupt the trial court with a contemporaneous objection the moment the victim made her statement about seeing the defendant at the pretrial hearing. So, then, the question is whether defense counsel objected at the first opportunity when he waited until after the

recess to object. The trial court concluded his questioning of the victim, and nothing of any note took place prior to the defense objection, with the exception of a brief recess. The trial court's consideration of the in-court identification was not interrupted by further direct or cross examination, nor were any other witnesses called before the objection. As in *Gamble*, the trial judge was able to hear the objection and consider the evidence pertaining to the in-court identification for only its proper purpose. Therefore, we hold that the defense objection, made under these limited circumstances in a bench trial, was made at the first opportunity. Thus the issue of the in-court identification is preserved for appeal.

In *Hayes v. State*, 311 Ark. 645, 846 S.W.2d 182 (1993), we upheld a trial court's ruling that an in-court identification was admissible, though an identifying witness testified that he "became unglued" when he saw the man who he believed had robbed him on television, then later identified the same man in a photo lineup. Furthermore, the victim in *Hayes* had been hesitant in identifying the defendant in a pretrial hearing because the defendant had cleaned up his appearance. *Id.*

In the instant case, the victim explained that she had fallen asleep soon after the rape and was having trouble remembering things when the police showed her the photo array later that morning. While she did select a photo of someone other than Mr. Mezquita, she said she was not sure; and she never positively identified anyone other than him. Mr. Mezquita argues that the opportunity for Ms. Frank to view him at the pretrial hearing impermissibly tainted her later in-court identification because Ms. Frank was aware that Mr. Mezquita was charged with her rape. However, Ms. Frank's testimony belies that assertion. She stated that she recognized Mr. Mezquita immediately when she saw him at the pretrial hearing and that "he didn't come up to the front or anything." Mr. Mezquita was out on bail shortly after his arrest until his conviction. Thus, he would not have been dressed in jail clothes at the pretrial hearing, and nothing in the record indicates that Mr. Mezquita was seated at the defense table when Ms. Frank first spotted him.

The United States Supreme Court dealt with a similar case in *Moore v. Illinois*, 434 U.S. 220 (1977). In *Moore*, the Court held that a pretrial corporeal identification was impermissible because the defendant in that case had been denied his Sixth Amendment right to counsel when he was viewed by a victim at a

pretrial bail hearing. *Id.* The Court discussed the dangers inherent in a pretrial identification conducted in the absence of counsel:

> Persons who conduct the identification procedure may suggest, intentionally or unintentionally, that they expect the witness to identify the accused. Such a suggestion, coming from a police officer or prosecutor, can lead a witness to make a mistaken identification. The witness then will be predisposed to adhere to this identification in subsequent testimony at trial. If an accused's counsel is present at the pretrial identification, he can serve both his client's and the prosecution's interests by objecting to suggestive features of a procedure before they can influence a witness's identification.

*Id.* at 225-26 (citing *U.S. v. Wade*, 388 U.S. 218 (1967)). The court went on to explain that the suggestiveness of the pretrial procedure could have been avoided if the defendant had been represented by counsel at the hearing:

> For example, counsel could have requested that the hearing be postponed until a lineup could be arranged at which the victim would view petitioner in a less suggestive setting. Short of that, counsel could have asked that the victim be excused from the courtroom while the charges were read and the evidence against petitioner was recited, and that petitioner be seated with other people in the audience when the victim attempted an identification. Counsel might have sought to cross-examine the victim to test her identification before it hardened. Because it is in the prosecution's interest as well as the accused's that witnesses' identifications remain untainted, we cannot assume that such requests would have been in vain. Such requests ordinarily are addressed to the sound discretion of the court; we express no opinion as to whether the preliminary hearing court would have been required to grant any such requests.

*Id.* at 230, n. 5 (citations omitted).

At his pretrial hearing, Mr. Mezquita was represented by counsel; therefore the Sixth Amendment rights with which the *Moore* court was concerned were protected. Moreover, there was never a request made for a live line-up or to have the victim sequestered to prevent her from viewing Mr. Mezquita.

The trial court heard evidence that Ms. Frank had ample opportunity to observe her attacker both during his previous visits to the E-Z Mart and under well-lit conditions when he attacked her. Her prior description of her attacker perfectly meshed with Mr. Mezquita, in that he is Hispanic, of slender build, in his early twenties, and had clothing identical to that described by the victim. Ms. Frank never positively identified anyone prior to the pretrial hearing. She testified that she recognized Mr. Mezquita as her attacker the first time she saw him in April at the pretrial hearing, and she was "100 percent" positive when she confronted Mr. Mezquita at trial. While her first recognition of Mr. Mezquita occurred several months after the rape, the trial court noted that immediately after the rape, Ms. Frank was able to assist police in creating the computer-generated composite, which, according to the trial court, was "remarkably similar" to Mr. Mezquita. On the basis of all these factors, we cannot say the trial court erred in admitting the in-court identification.

### The Appellant's Rights Under the Vienna Convention on Consular Relations

Several of Mr. Mezquita's points on appeal concern the failure by police to inform him of rights under the Vienna Convention on Consular Relations (VCCR). Mr. Mezquita argues that (1) the case should be remanded for a determination as to whether he was "detained" as defined by the VCCR, (2) the VCCR grants individual rights to detained foreign nationals, (3) the case should be remanded for a showing of prejudice because of the VCCR violation, (4) the Exclusionary Rule is the proper remedy for a violation of the VCCR, (5) Mr. Mezquita did not voluntarily waive his VCCR rights, and (6) the statements made by Mr. Mezquita and the evidence seized at his apartment should be suppressed because his VCCR rights were violated. We will address the first point regarding detention because it is dispositive of all points on appeal regarding the VCCR.

The VCCR is a multinational treaty signed by the United States. As such, it is governed by the Supremacy Clause, under which treaties made by the United States are the "supreme law of the land." U.S. Const. Art. VI, Section 2. Mr. Mezquita's arguments are based in Article 36, paragraphs 1 and 2 of the VCCR, which provide:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, *a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner*. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this subparagraph*;

(c) consular officers shall have the right to visit a national of the sending State *who is in prison, custody or detention*, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State *who is in prison, custody or detention* in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national *who is in prison, custody or detention* if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws *and regulations* of the receiving State, subject to the proviso, however, that the said laws *and regulations* must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

*See* Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. NO. 6820 (emphasis added).

 The VCCR delineates "in custody" as something different than "detention," referring to a foreign national being "in custody" as being "custody pending trial," with no definition at all of "detention." *See* VCCR, Art. 36, § 1, *supra*. In a pretrial hearing held on June 4, 2001, defense counsel argued that Mr. Mezquita was "in custody," "under arrest," "locked in a room," and "detained in the interrogation room." These terms were argued as though they were all one and the same issue, never giving

the trial court any reason to think that separate rulings might be needed on whether the defendant was (1) in custody, (2) under arrest, or (3) detained. In fact, it is apparent from the record that defense counsel did not distinguish the three as separate issues, and this is borne out by the record of the opening remarks by defense counsel at the suppression hearing, where counsel stated:

> Yes, Your Honor, and that's our argument, that he was *in custody*. In fact, Mr. Mezquita is prepared to testify that if— that he was told that he would be released — when he left his house he would be released once he goes down to the police station and they take him into a room and they start asking — start asking him questions, and without even — they never told him he was under arrest, so Mr. Mezquita— Mr. Mezquita's argument is that he was *under arrest from the time he was taken into that room.*

(Emphasis added.)

In other words, defense counsel was arguing to the trial court that Det. Patten never told Mr. Mezquita he was under arrest at the close of his interview, so Mr. Mezquita had every right to believe he was under arrest the entire time, from the time he left the apartment with Det. Patten until the time he was booked. On this argument, Mr. Mezquita wanted a ruling from the trial court that he was in custody at the time of the interview.

Det. Patten's testimony was that, after Mr. Mezquita admitted in his interview to being at the E-Z Mart store, he was told he was being placed under arrest, he was handcuffed, and then he was taken down to be processed. Det. Patten further testified that he had never locked the door of the CID interrogation room and that Mr. Mezquita had been told several times that he did not have to speak to police. Indeed, the transcript of the cassette tape of Mr. Mezquita's pre-arrest statement has Mr. Mezquita reiterating his understanding that he voluntarily accompanied Det. Patten to the police station because he wanted to come and not because the detective made him come. The trial court found that Mr. Mezquita was not in custody at the time he made his statement, a finding that Mr. Mezquita does not challenge on appeal.

Instead of challenging the trial court's ruling on the custody issue, Mr. Mezquita claims the trial court used an incorrect "in custody" standard, and asks us to remand and require the trial court to perform another inquiry into whether or not he was

"detained" for the purposes of the VCCR. However, Mr. Mezquita never asked for nor obtained a ruling from the trial court as to whether or not he was "detained." It is well settled that the burden of obtaining a ruling is upon the movant, and unresolved questions and objections are waived and may not be relied upon on appeal. *State v. Montague*, 341 Ark. 144, 14 S.W.3d 867 (2000).

 Until Mr. Mezquita fell under the category of being "detained," "in custody," or "under arrest," his VCCR rights were not triggered. Mr. Mezquita's argument on appeal is that he was entitled to be informed of his VCCR rights prior to making his statements because he was detained at the time he made his statements. However, his failure to obtain a ruling on the issue of detention has waived this argument; thus, the remainder of his arguments regarding the scope of the VCCR and the remedy for its violation have been rendered moot.

### Validity of Ana Mezquita's Consent to Search

Mr. Mezquita's final assertion on appeal is that his wife's consent to search their apartment was invalid and the evidence seized in the search should be suppressed. His argument below was that his wife's consent was involuntary because she had not been informed of her VCCR rights. However, there was no evidence presented as to whether or not anyone had informed her of her VCCR rights. Furthermore, there was no testimony that Ana Mezquita was ever in custody, detained, or under arrest. During trial, Ana testified that she had given consent to search the apartment. Mr. Mezquita did not challenge this, nor did defense counsel in any way inquire about the VCCR.

 On appeal, Mr. Mezquita has abandoned his VCCR challenge to his wife's consent and instead makes the argument that her consent was invalid because of the early hour of the search. A party is bound by the scope of arguments made at trial, and we will not consider an argument raised for the first time on appeal. *Mays v. State*, 351 Ark. 26, 89 S.W.3d 926 (2002). Therefore, we decline to address Mr. Mezquita's argument regarding his wife's consent.

Affirmed.

THORNTON, J., not participating.