Kanai GIKONYO *v.* STATE of Arkansas

CA CR 07-609 283 S.W.3d 631

Court of Appeals of Arkansas
Opinion delivered April 30, 2008

*David O. Bowden*; and *Hicks Law Firm*, by: *Rickey H. Hicks*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

KAREN R. BAKER, Judge. Appellant Kanai Gikonyo was convicted in Saline County Circuit Court of internet stalking of a child pursuant to Ark. Code Ann. § 5-27-306 (Repl. 2006). He was sentenced to eight years' imprisonment in the Arkansas Department of Correction, fined $7000, and required to register as a sex offender. Appellant contends that the trial court erred in three respects. First, appellant asserts that there was no substantial evidence to support his conviction for internet stalking. Second, appellant

asserts that his statements while in custody should have been suppressed because he was not advised of his rights as a foreign national under the Vienna Convention on Consular Relations. Third, appellant asserts that the State failed to demonstrate that the expert witness called to examine the computer (allegedly belonging to him) had either the required level of expertise or utilized methods and procedures that were of a type and quality normally and reasonably relied upon by experts in the field of computer forensics. We affirm on all points.

## I. Sufficiency of the Evidence

Appellant's first assertion is that there was no substantial evidence to support his conviction for internet stalking.[1] A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Lamb v. State*, 372 Ark. 277, 275 S.W.3d 144 (2008) (citing *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001)). The test for such motions is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.* On appeal, we review the evidence in the light most favorable to the appellee and consider only the evidence that supports the verdict. *Id.* The credibility of witnesses is an issue for the fact finder and not for the appellate court. *Meadows v. State*, 360 Ark. 5, 199 S.W.3d 634 (2004). The fact finder may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Id.*

At the time the offense was committed, a person committed the offense of internet stalking of a child if the person being twenty-one years of age or older knowingly used a computer online service, internet service, or local internet bulletin-board service to seduce, solicit, lure, or entice an individual that the person believes to be fifteen (15) years of age or younger in an effort to arrange a meeting with the individual for the purpose of

---

[1] As a subpoint, appellant also contends that the statute is unconstitutional as applied to him. However, appellant did not make this argument below and raises it for the first time on appeal. We will not address arguments, even constitutional arguments, raised for the first time on appeal. *Dowty v. State*, 363 Ark. 1, 210 S.W.3d 850 (2005); *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004).

engaging in sexual intercourse, sexually explicit conduct, or deviate sexual activity as defined in Ark. Code Ann. § 5-14-101. Ark. Code Ann. § 5-27-306(a)(2) (Repl. 2006). The crime was a Class C felony at the time in question. Ark. Code Ann. § 5-27-306(b)(2) (Repl. 2006).

The following evidence was presented at appellant's trial. Deputy Charles Barker with the Saline County Sheriff's Department testified that he was assigned to internet crime investigations. He testified that he was trained in the investigation of internet stalking cases and assisted in writing the law-enforcement standards for child exploitation classes in Arkansas. On May 4, 2006, at 5:03 p.m., he was "trolling" chat rooms and was logged on a Yahoo chat room as a thirteen-year-old girl from Benton. His user name was "Kim Stahli." While online as Kim Stahli, an individual attempted to contact him with the name LRKG99. Approximately sixteen lines into the conversation, he told LRKG99 that he was a thirteen-year-old girl. LRKG99 responded that he knew "Kim" was underage, that he was much older, and that he would go to jail if he met "Kim." Barker testified that after "Kim" revealed her age, the conversation "turned sexual in nature." LRKG99 called "Kim" "jail bait" and asked if she had "tits." He also asked "Kim" if she had engaged in sexual intercourse. "Kim" responded that she had not. LRKG99 also said that "If we have sex, I'm so big you'd get hurt. Your organs aren't fully grown, yet." He also said that he could not get with "Kim," and asked if she had older friends.

Deputy Barker testified that LRKG99 also suggested the possibility of meeting "Kim." LRKG99 asked "Kim" what she wanted him to do. "Kim" responded that she wanted "to have fun." LRKG99 responded, "How can I do that without sleeping with you? I don't want to ruin your organs." When "Kim" asked LRKG99 what he wanted to do, he responded, "No clue, whatever you want."

Deputy Barker also testified that LRKG99 and "Kim" had other conversations. LRKG99 talked about how when they met, he would not be able to stay long. "Kim" told LRKG99 that she did "quickies." LRKG99 also informed "Kim" that "[he] had no rubbers." "Kim" asked if three would be enough, and LRKG99 responded "Yeah." "Kim" asked, "Now that I have them will we, whenever?" LRKG99 responded, "We will agree when we meet, I'll let you see if you can handle what I have." Barker testified that he "concluded from the entire chat log that [LRKG99's] intention was to have sex."

Deputy Barker testified that ultimately, a meeting between LRKG99 and "Kim" was arranged. The meeting place was the BP Gas Station located at Exit 116 in Benton at 6:30 p.m. LRKG99 described himself to "Kim" as a black male named Ken and told her that he drove a white, 2-door Audi.

Deputy Barker testified that he had access to an apartment building across the street from the BP Station. From the window, he could monitor one side of the BP parking lot. He requested Detective Robertson's help in monitoring the other side of the parking lot. Deputy Barker testified that appellant was arrested before Barker arrived at the apartment. Deputy Barker testified that appellant's rights were read to him and that appellant understood those rights. Appellant was able to communicate with authorities fully and completely. Appellant did not appear to be under the influence of any substance. Appellant spoke freely and voluntarily with the officers.

Detective Gary Robertson testified that he was involved in the May 4, 2006 internet stalking investigation. After receiving the call from Deputy Barker, he arrived at the BP Station and waited for further instructions. Detective Robertson was instructed to look for a black male driving a small, white car, specifically a 2-door Audi. He was told the meeting would occur around 6:30 p.m. At approximately 6:35 to 6:40 p.m a man matching the description pulled up to the BP Station in a white 2-door BMW. Detective Robertson testified that the driver "appeared to be scanning the area." Detective Robertson initiated contact, parked his police car in front of appellant's car, and turned on his emergency lights.

Appellant told Robertson that his name was "Ken." Detective Robertson read appellant his rights and transported appellant to the police station. An inventory search was conducted of appellant's vehicle. The inventory search revealed several condoms in the trunk. The vehicle's gas tank was almost full of gas. After the inventory search results, Detective Robertson returned to the police station to speak with appellant. Detective Robertson read appellant his rights again. Appellant did not have any questions about his rights. Detective Robertson testified that appellant "appeared to have command of the English language." Appellant did not appear to be under the influence of drugs or alcohol. Detective Robertson testified that appellant was "cooperative." Detective Robertson testified that appellant informed the officers that he was at the BP Station only to "help this girl." Appellant

admitted that he knew that the girl was underage, and if he had had the opportunity to have met her, he would have informed the girl to go home and stay off the internet. Appellant also admitted to Detective Robertson that he was "LRKG99." Appellant told officers that his date of birth was January 21, 1976, and his driver's license, which was introduced into evidence, confirmed that he was truthful about his date of birth. Appellant told the officers that he was originally from Kenya and had been in the United States for many years. Appellant received seven years of college education in the United States. Detective Robertson testified that upon finding out that appellant was originally from Kenya, Robertson did not contact the Kenyan Embassy because he was not aware of any obligation to do so.

A search of appellant's residence was also conducted. Detective Robertson testified that appellant had two roommates. One of his roommates was Scottish and the other was Asian. There, authorities photographed the computer screen showing Yahoo messenger with LRKG99. Authorities seized two computer hard drives, a couple of plaques, and a laptop. The evidence was taken to the police station, packaged, sealed with tape, and initialed by Detective Robertson. The evidence was then stored in the crime lab.

Christopher Edquist, a digital evidence analyst with the State Crime Laboratory, testified that Detective Gary Robertson requested that he analyze a computer taken from appellant's home. Edquist testified that in such situations, he removed the hard drive from the computer, connected it to a hardware rock blocker, and searched for the requested information. In this case, he was asked to review the hard-drive information for child-porn images and chats with young girls. The registered owner of the computer was "K. Gikonyo." The profile name for the chats was LRKG99. Edquist found approximately 10,000 chats on the computer, and he was specifically asked to review the chats on the day of the incident. He testified, "there were several chats on that particular day." On cross examination, Edquist acknowledged that he was unable to determine if a file had been altered in any way.

At the close of the State's case, defense counsel made a motion for a directed verdict. The trial court denied the motion. Defense counsel renewed the motion at the close of all the evidence, and the motion was denied. This appeal followed.

A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred

from the circumstances of the crime. *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003). Because intent cannot be proven by direct evidence, the fact finder is allowed to draw upon common knowledge and experience to infer it from the circumstances. *Lafort v. State*, 98 Ark. App. 202, 254 S.W.3d 27 (2007) (citing *DeShazer v. State*, 94 Ark. App. 363, 230 S.W.3d 285 (2006)). Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004).

In the instant case, appellant admitted to officers that he had chatted with the girl on the internet. He told the officers that he was only there to help the girl. Appellant also told the officer that if he had met the girl at the BP Station, he would have instructed her to go home and get off the internet. He also admitted to Detective Robertson that he was "LRKG99." Appellant told Detective Robertson that his date of birth was January 21, 1976, and his driver's license confirmed that January 21, 1976, was the date of his birth. The computer recovered from appellant's home was registered to "K. Gikonyo," and Mr. Edquist found chats attributed to the screen name "LRKG99" on the computer.

Moreover, the testimony showed that "Kim" informed LRKG99 very early on that she was only thirteen. LRKG99, on the other hand, indicated that he was older and that he would go to jail if he met her. However, Deputy Barker testified that the conversation became sexual in nature from that point forward. After establishing that they would meet, LRKG99 told "Kim" that he would be in a white, two-door Audi. LRKG99 indicated that three condoms would suffice and indicated that they would decide after they met if "Kim" could "handle what [he] had." Appellant did, in fact, arrive at the BP Station around 6:35 p.m. in a white two-door car. Deputy Barker concluded that based on his experience, LRKG99 was luring "Kim" to meet him at the BP Station to have sex. Based on the foregoing, we hold that substantial evidence supports appellant's conviction for internet stalking of a child.

## II. Motion to Suppress

Appellant asserts that his statements while in custody should have been suppressed because he was not advised of his rights as a

foreign national under the Vienna Convention on Consular Relations.[2] Specifically, he contends that he had the right to contact the Kenyan embassy before questioning because he was a "Kenyan national, originally raised speaking the Kikyuyu [sic] language," and although he spoke "standard conversational English, he ha[d] no experience in the technical aspects of legal and police jargon." The trial court denied appellant's motion to suppress. In so ruling, the trial court noted the fact that appellant had been in the United States for twelve years and had obtained a bachelor's degree and graduate degree while here, which suggested that appellant spoke satisfactory English. Appellant cites the case of *Mezquita v. State*, 354 Ark. 433, 125 S.W.3d 161 (2003). In *Mezquita*, the appellant argued that the police failed to inform him of his rights under the VCCR. *Mezquita*, 354 Ark. at 446, 125 S.W.3d at 168-69. However, our supreme court held that Mezquita had waived the argument when he failed to obtain a ruling from the trial court as to whether he was in fact "detained." *Id.* at 449, 125 S.W.3d at 170. Like the *Mezquita* case, there was no ruling here on whether appellant was "detained."

 Since *Mezquita*, the Supreme Court has decided the recent case of *Medellín v. Texas*, 128 S.Ct. 1346 (2008). In the *Medellín* case, Medellín filed a second Texas state-court habeas application challenging his state capital-murder conviction and death sentence on the ground that he had not been informed of his Vienna Convention rights. *Medellín*, 128 S.Ct. at 1348. In doing so, Medellín relied on the International Court of Justice decision in *Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (Mar. 31) (where the ICJ held that the United States had violated Article 36(1)(b) of the VCCR by failing to inform fifty-one named Mexican nationals, including petitioner Medellín, of their Vienna Convention rights) and the President's Memorandum (stating that the United States would "discharge its international obligations" under *Avena* "by having State courts give effect to the decision"). *Id.* The Texas Court of Criminal Appeals dismissed Medellín's application as an abuse of the writ, concluding that neither *Avena* nor the President's Memorandum was binding federal law that could displace the State's limitations on filing successive habeas applications. *Id.* In *Medellín*, the Supreme Court concluded that,

---

[2] The Vienna Convention on Consular Relations ("VCCR") is a multinational treaty signed by the United States. *Mezquita v. State*, 354 Ark. 433, 125 S.W.3d 161 (2003).

"In sum, while treaties 'may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.' " *Medellín*, 128 S.Ct. at 1356 (quoting *Igartua-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005)). Pursuant to the Supreme Court's decision in *Medellín*, we need not address whether appellant was "detained" at the time his statement was made because the VCCR is not domestically enforceable.

### III. Admission of Expert Witness's Testimony

Appellant's final point on appeal concerns an evidentiary ruling. Appellant asserts that the State failed to demonstrate that the expert witness had either the required level of expertise or utilized methods and procedures that were of a type and quality normally and reasonably relied upon by experts in the field of computer forensics.[3] Appellant contends that Mr. Edquist was testifying at trial for the first time; had not yet completed his certification; had reviewed fifty computers, none of which had been utilized as evidence in a criminal trial; and could not explain the Pirabi decoder software that he used. The circuit court has wide discretion in making evidentiary rulings, and we will not reverse its ruling on the admissibility of evidence absent an abuse of discretion. *See Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006). If some reasonable basis exists demonstrating that a witness has knowledge of a subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Id.* Under Arkansas Rule of Evidence 702, an expert's testimony is admissible if his scientific, technical, or specialized knowledge will aid the trier of fact in understanding the evidence. *Brown v. State*, 60 Ark. App. 215, 991 S.W.2d 137 (1999). Once an expert is qualified, any lack of foundation for the expert's opinion goes to the weight of the evidence, not its admissibility. *See, e.g., Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000).

---

[3] Also in appellant's third point on appeal, he argues that the evidence upon which Mr. Edquist relied was not the kind normally utilized by experts in his field, citing *Daubert v. Merrell-Dow Pharm. Inc.*, 509 U.S. 579 (1993). However, appellant failed to make any argument to the trial court pursuant to *Daubert*, thus, he has raised that argument for the first time on appeal. Our supreme court has stated that an argument raised for the first time on appeal will not be considered. *Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998).

■ At trial, Mr. Edquist testified as to his investigation of the computer hard drive. He testified that he was instructed to search for child-porn images and chats with young girls on the computer's hard drive. He testified that there were several chats from the day in question; that the computer was registered to "K. Ginkonyo," and that the profile name for the chats was LRKG99. Mr. Edquist's testimony was based on his own experience and observation. Because we find that Mr. Edquist's testimony was helpful to the trier of fact, we find no error in the admission of Mr. Edquist's testimony.

Accordingly, we affirm.

GRIFFEN and VAUGHT, JJ., agree.