2011 Ark. App. 221

**Zafar IQBAL, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–380.**

Court of Appeals of Arkansas.

March 16, 2011.

**34.** *Id.*

**35.** *See Chiodini v. Lock,* 2010 Ark. App. 340, 374 S.W.3d 835.

**36.** *Id.*

Jeffrey Marx Rosenzweig, Little Rock, for appellant.

Dustin McDaniel, Atty. Gen., Eileen Harrison, Little Rock, for appellee.

WAYMOND M. BROWN, Judge.

This criminal case stems from transactions between the appellant, Zafar Iqbal, and Magness Oil Company, a wholesale and retail distributor of petroleum products. Iqbal was charged with and convicted of theft of property and sentenced to two years' imprisonment followed by three years' suspended imposition of sentence. Iqbal seeks reversal of the conviction, arguing that the criminal proceeding was merely an attempt to collect a debt. He further alleges that he was denied his constitutional rights to counsel and to due process when documents prepared and signed by his attorney were used against him. We hold that the State presented sufficient evidence to establish that Iqbal obtained fuel by deceiving Magness Oil into believing that he has interests in certain property. We also hold that Iqbal failed to show that the State created a conflict of interest between him and his trial attorney. Therefore, we affirm.

## Background

We recount the evidence in the view

most favorable to the State.[1] Iqbal's wife, Betty Jane, is the sole owner of Chuck Wagon, Inc. d/b/a One Stop, a convenience store and gas station. Iqbal has no interest in the business, but he works as a manager. In March 2007, he started purchasing fuel from Magness Oil. The purchases were initially on a cash basis, but later that month, Iqbal filled out a "Credit Application/Consignment Application." He listed Betty Jane as owner of the gas station, and he listed himself as the manager and the person to contact for further information. He stated that the store had been in business for six months, and he denied ever filing for bankruptcy. At trial, Magness Oil's president, Benny Magness, explained that the question regarding bankruptcy was important because he did not want to do business with anyone who had filed for bankruptcy. The bottom of the form has the handwritten notation, "Approved—Consignment Fuel Account— Settlement 10 days from delivery. JM." The initials "JM" refer to Jeffrey Magness, Magness Oil's vice president and Benny's son. Payment was made by automatic draft.

In November 2007, three automatic drafts were returned for insufficient funds. Jeffrey attempted to contact Iqbal, but to no avail. He went to Iqbal's residence to look for him and was finally able to make contact. Jeffrey kept in contact with Benny via cell phone, and Benny instructed Jeffrey to sign a handwritten contract. Jeffrey explained that Iqbal represented himself to be the owner in any and all conversations. While at Iqbal's home, Jeffrey drafted a "gas supply agreement" by hand. In the agreement, Iqbal is listed as the station owner. The agreement provided, in relevant part, "For security of gasoline station owner agrees to provide Magness Oil Company titles to two vehicles owned by station owner, 2nd mortgage of owner personal house, and assign proceeds of debt of three customer charge accounts." Despite this agreement, Magness Oil never received the vehicle titles, the mortgage, or the assignment of proceeds. As it turned out, Iqbal did not own any vehicles or a house (the house in which he lived was in Betty Jane's name).

On November 20, 2007, Iqbal traveled to Mountain Home and signed a normal consignment fuel-supply contract with Magness Oil. At trial, Benny explained that he was going to enter into a contract with Iqbal or turn the returned drafts to the hot-check office. The contract listed Iqbal as the owner of the One Stop, and Benny testified that Iqbal told him that he owned the One Stop with his wife Betty Jane.

At trial, Benny presented five unpaid invoices for fuel deliveries in March 2008, totaling $104,540.81 (there was testimony questioning whether this amount was actually paid in full, but for the purposes of this appeal, we assume that it was not). On March 29, he called Iqbal and told him that he owed money on the account. Iqbal wanted another delivery of gas, but he told Benny that he could not pay for the previous invoice. Benny threatened to file a complaint with the sheriff's office and the prosecuting attorney if Iqbal did not pay.

On March 31, 2008, Benny received a letter from Iqbal's attorney, indicating that Iqbal had filed for Chapter 7 bankruptcy in August 2007 and that Iqbal had started taking delivery from another fuel provider. This was the first time Benny learned that Iqbal had filed bankruptcy. Other docu-

---

1. *See, e.g., Watson v. State,* 358 Ark. 212, 188 S.W.3d 921 (2004); *DeShazer v. State,* 94 Ark. App. 363, 230 S.W.3d 285 (2006) (both noting that, in reviewing the sufficiency of the evi-dence to support a criminal conviction, appellate courts view the evidence in the light most favorable to the State, considering only the evidence that supports the guilty verdict).

ments entered into evidence show that Iqbal filed for Chapter 13 bankruptcy in August 2007 (it was converted to a Chapter 7 filing in January 2008). An amended filing shows Magness Oil as a creditor to the tune of $104,000.

During the bankruptcy proceedings, Benny learned that Iqbal did not own any real property or vehicles. He also learned that Iqbal did not own an interest in the One Stop. Benny testified that, had he known that Iqbal was merely an employee of the One Stop, he would not have done business with him. He also stated that he relied on the handwritten contract as proof that he was the owner. A few weeks after receiving the letter from Iqbal's attorney, Benny filed a criminal complaint with the sheriff's office, who forwarded the matter to the prosecuting attorney. Iqbal was then charged with theft of property.

Betty Jane filed for Chapter 13 bankruptcy in October 2008. She filed a statement of financial affairs in bankruptcy court in December 2008. This statement listed her as 51% owner of the gas station and Iqbal as 49% owner. Regarding the statement of her current income, the filing listed Betty Jane as "manager" of the One Stop and Iqbal as the "co manager." She testified, however, that the filing was a mistake and that she owned 100% of the business. She could not explain why the filing had Iqbal as 49% owner. Also entered into evidence was a brief in support of a motion to dismiss, filed by Iqbal's attorney. In the brief itself, there are several references to "Zafar Iqbal d/b/a Chuck Wagon, Inc./One Stop." There is a similar reference in an affidavit attached as an exhibit.

The court also heard testimony from Roger Mason and John Grisham, both of whom also deliver fuel to retail stores. Both sold gas to Iqbal, who represented himself to be the owner of the One Stop. Another distributor, Milton Satterfield, also testified that he delivered fuel to the One Stop and did business with Iqbal, not Betty Jane. In cross-examination, however, he stated that Betty Jane signed the authorization form for electronic drafts.

At the end of the State's case, Iqbal moved for directed verdict. He argued that the proceeding was strictly an attempt to collect a debt, which was inappropriate for a criminal proceeding. The court denied his motion. The jury found Iqbal guilty of one count of theft of property, and he was sentenced to two years' imprisonment, followed by three years' suspended imposition of sentence. He was also ordered to pay $104,540.81 in restitution to Magness Oil.

### Directed Verdict Motion

First, Iqbal argues that the circuit court should have granted his motion for directed verdict. As he did at trial, he asserts that the criminal proceeding against him was merely an attempt to collect a debt and that such procedure is not supported by the law.

When considering a challenge to the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the State, considering only the evidence in favor of the guilty verdict, and affirm if the conviction is supported by substantial evidence.[2] Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture.[3] We make no distinction between circumstantial and direct evidence when review-

2. *Mitchem v. State*, 96 Ark.App. 78, 238 S.W.3d 623 (2006).

3. *Baughman v. State*, 353 Ark. 1, 110 S.W.3d 740 (2003).

ing for sufficiency of the evidence.[4] But for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence.[5] The question of whether it does is for the trier of fact to decide.[6]

To convict Iqbal of theft of property, the State had to prove that he knowingly obtained the property of another person, by deception or by threat, with the purpose of depriving the owner of that property.[7] The definition of "deception" includes "[c]reating or reinforcing a false impression, including a false impression of fact, law, value, or intention or other state of mind that the actor does not believe to be true"; "[f]ailing to correct a false impression that the actor knows to be false and that he or she created or reinforced or that he or she knows to be influencing another person to whom the actor stands in a fiduciary or confidential relationship"; and "[e]mploying any other scheme to defraud."[8] The act of deprivation includes making use of the property of another for purposes other than for what it was promised.[9]

A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime.[10] Because intent cannot be proven by direct evidence, the fact-finder is allowed to draw upon common knowledge and experience to infer it from the circumstances.[11] Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts.[12] Further, the intention and design of the party are best explained by a complete view of every part of his conduct at the time, and not merely from the proof of a single and isolated act or declaration.[13]

The crux of Iqbal's argument is that the mere nonpayment of a debt cannot form the basis for a theft charge. He is correct in this regard. As to a person's intention to perform a promise, a jury may not infer "deception" solely from the fact that the person did not subsequently perform the promise.[14] The appellate courts have reversed several theft convictions when the record lacked evidence showing deception.

In *Cates v. State*,[15] the appellant contracted with a couple to build a house, and an escrow account was set up to pay for the costs. When the appellant received a bill from a subcontractor, he would take it to the couple for approval, then the bank would disburse the money. The appellant

4. *Booker v. State*, 335 Ark. 316, 984 S.W.2d 16 (1998).

5. *Id.*

6. *Phillips v. State*, 88 Ark.App. 17, 194 S.W.3d 222 (2004).

7. Ark.Code Ann. § 5–36–103(a)(2) (Supp. 2009).

8. Ark.Code Ann. § 5–36–101(3)(A)(i), (iii), (v) (Repl.2006).

9. *See Hardcastle v. State*, 25 Ark.App. 157, 755 S.W.2d 228 (1988); *Hixson v. State*, 266 Ark. 778, 587 S.W.2d 70 (Ark.App.1979).

10. *Gikonyo v. State*, 102 Ark.App. 223, 283 S.W.3d 631 (2008).

11. *Id.*

12. *Id.*

13. *Kerby v. State*, 233 Ark. 8, 342 S.W.2d 412 (1961) (quoting *Baker v. State*, 4 Ark. 56 (1842)).

14. Ark.Code Ann. § 5–36–101(3)(B).

15. 267 Ark. 726, 589 S.W.2d 598 (Ark.App. 1979).

withdrew from the project when the home was only 77% complete. By this time, he had withdrawn $28,500 from the escrow account, including $4000 for his own use. The jury convicted the appellant of theft, but we reversed. We wrote that the only evidence presented that could support the conclusion that the appellant did not intend to pay the liens was inferred solely from the fact that he did not subsequently pay off the liens.

In *Wiley v. State*,[16] the appellant was charged with theft after he failed to pay for some lumber. The evidence showed that he contracted with a company to buy lumber and building materials on credit. He intended to build a house on property left to him by his grandfather. The appellant purchased a substantial amount of lumber and materials, but the company received no payment. The owner of the company went to the property and found no lumber or materials on the site, at which point he concluded that he had been given false information [9] and contacted the prosecuting attorney. The appellant testified that he had intended to build a house but did not do so due to personal and financial difficulties. There was confusion as to whether the appellant was charged with theft by deception or by taking unauthorized control of property, but in either case, we held this evidence to be insubstantial proof to support the conviction.

And in *Cox–Hilstrom v. State*,[17] the appellant leased a business from another person, but he vacated the premises five months later. He was charged with and convicted of theft by deception for maintaining an account under the lessor's account number at a local newspaper. The court denied the appellant's motion for directed verdict, reasoning that the appellant would have requested a new account number after taking over the business had he not intended to deceive. We could find no evidence that the appellant made a false statement to the newspaper, and we saw that the only evidence unfavorable to the appellant was that he failed to pay the account during the five-month period. We ultimately reversed the conviction.

In the aforementioned cases, there was no evidence upon which a jury could find that the appellant used deception to deprive the victims of their property. That being said, the appellate courts have affirmed convictions after the victim has come to realize that they had been deceived out of their money.

[10] In *Dean v. State*,[18] the appellant was charged with the crime of false pretenses after he represented that he made money in the cattle business. He convinced the victim to invest his money in cattle. The victim became suspicious two months later, and conversations between the appellant and the victim's attorney revealed that the appellant was not in the cattle business, that he had not purchased any cattle, and that he did not know what happened to the victim's money. Our supreme court held that the State presented sufficient evidence to present the issue to a jury.

In *Wilson v. State*,[19] the appellant made a deal to sell timber to a sawmill owner. The timber was to be cut from land that the appellant claimed to have either leased or purchased. After the owner paid for the timber, he learned that the appellant had no interest in the property where the timber was to come from. When the owner demanded return of his money, the

16. 268 Ark. 552, 594 S.W.2d 57 (Ark.App. 1980).

17. 58 Ark.App. 109, 948 S.W.2d 409 (1997).

18. 258 Ark. 32, 522 S.W.2d 421 (1975).

19. 277 Ark. 43, 639 S.W.2d 45 (1982).

appellant gave him two bad checks. Our supreme court held that this evidence was sufficient to support the charge.

Finally, the appellants in *Williams v. State*[20] operated a store selling motorized scooters, four-wheelers, bicycles, and mini-choppers. Several of their customers complained after they purchased items but never received the items or a refund. The State charged the appellants with several counts of theft of property. We affirmed the subsequent conviction, noting that the evidence showed a pattern of purposely delaying delivery of merchandise and offering mostly untrue excuses for why an item had not arrived.

■■■ Returning to the case presently before us, the State presented testimony regarding the Iqbals' bankruptcies and Benny Magness's desire not to deal with customers who have filed bankruptcy. The record shows that Iqbal did not file for bankruptcy until after he started receiving product from Magness Oil, and we find nothing in the record suggesting that Iqbal affirmatively hid that status.

Nonetheless, we affirm Iqbal's conviction because the State presented substantial evidence that he knowingly deceived Magness Oil in an effort to get fuel for the One Stop. Specifically, a jury could reasonably find that Iqbal represented himself to be the owner of the One Stop when in fact he was not, that he represented himself to own certain other property intended to be used as collateral when in fact he did not, and that he made these representations so that Magness Oil would continue to supply him fuel for the One Stop. This case is not like *Cates, Wiley,* and *Cox–Hilstrom,* where the court had nothing before it to

explain the nonpayment of an obligation. Rather, we liken this case to *Dean* and *Wilson,* where the appellants made affirmations to induce their victims to give up their money.

In light of the evidence suggesting that Iqbal misrepresented what he owned to induce Magness Oil to give him fuel for his wife's convenience store, we hold that the State presented sufficient evidence to support a conviction for theft of property. We affirm on this point.

### Right to Counsel and Due Process

Next, Iqbal asserts that he was denied his constitutional rights to counsel and due process when several documents prepared by his attorney were used against him. He acknowledges that he made no objection at trial, but he contends that the introduction of those documents created a massive conflict of interest and that such a claim is an exception to the contemporaneous-objection rule, as outlined in *Wicks v. State.*[21]

At trial, the State presented three documents prepared by Iqbal's attorney, who also served as his attorney during the bankruptcy proceedings. The first was a letter from counsel to Benny, notifying Benny that Iqbal had filed for bankruptcy. The second was a copy of Iqbal's bankruptcy filing, which listed his trial counsel as his bankruptcy attorney. An amended version of the filing showed a $104,000 debt owed to Magness Oil. The third was a brief in support of a motion to dismiss in this case and an attached affidavit. In these documents, there are several references to "Zafar Iqbal d/b/a Chuck Wagon, Inc./One Stop." Iqbal's trial attorney did

---

**20.** 2009 Ark. App. 848, 2009 WL 4851104.

**21.** 270 Ark. 781, 606 S.W.2d 366 (1980).

not object to the admissibility of any of these documents.

Normally, a contemporaneous objection is necessary to preserve a matter for appeal.[22] But our supreme court has recognized four narrow exceptions to this rule: (1) when the trial court, in a death-penalty case, fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself, (2) a trial court errs at a time when defense counsel has no knowledge of the error and hence no opportunity to object, (3) a trial court should intervene on its own motion to correct a serious error, and (4) the admission or exclusion of evidence affects a defendant's substantial rights.[23] Iqbal asserts that the admission of the documents against him falls under exceptions three and four.

We pass on the question of whether this case presents a scenario that would fall under an exception under *Wicks*. Assuming (but not deciding) that it does,[24] Iqbal failed to show that the introduction of the documents in question created a conflict of interest between him and his trial attorney. The letter from Iqbal's attorney to Benny was introduced only to show the date that Benny learned of Iqbal's bankruptcy filing. The bankruptcy filings were obtained by Benny's attorney. Nowhere does Iqbal raise the issue of the accuracy or the propriety of these documents. And while Iqbal could not reasonably argue for the exclusion of his affidavit, we see nothing in the rest of the pleading that contains anything that was not presented to the jury at trial.

Iqbal's entire argument is premised upon his assumption that the introduction of those documents was the equivalent of forcing his attorney to be a witness against his client. No such thing happened here. We agree that a lawyer is prohibited from mixing the role of advocate and witness.[25] A defendant who can show that there existed a conflict of interest that affected the adequacy of his attorney's representation need not demonstrate prejudice in order to obtain relief[26] But this presumption does not arise until the defendant shows an actual conflict; the possibility of a conflict is insufficient to impugn a criminal conviction.[27] The admission of the documents in question did not pit Iqbal against his attorney or vice versa. And the documents are consistent with other evidence introduced at trial.

In short, we hold that Iqbal failed to show that a conflict of interest arose as a result of the court allowing the State to introduce documents produced by his trial

22. *Id.*

23. *Id.*

24. The State cites *Rackley v. State*, 371 Ark. 438, 267 S.W.3d 578 (2007), and *Cook v. State*, 76 Ark.App. 447, 68 S.W.3d 308 (2002), in support of its position that the *Wicks* exception is inapplicable here. In both cases, the appellate court declined to extend *Wicks* to claims of ineffective assistance of counsel where an attorney represents co-defendants. We believe the present case is distinguishable and decline to apply those cases here.

25. *See* Ark. R. Prof'l Conduct 3.7 (stating that lawyer shall not act as advocate at a trial in which he or she is likely to be a necessary witness except under narrowly defined circumstances); *Smith v. Wharton*, 349 Ark. 351, 78 S.W.3d 79 (2002) (citing several cases for the proposition that attorneys should not act as trial counsel and as a material witness).

26. *Cook v. State*, 361 Ark. 91, 204 S.W.3d 532 (2005) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

27. *Id.*

attorney in this case. We affirm on this point as well.

Affirmed.

HART and WYNNE, JJ., agree.