2013 Ark. App. 402

**Rodney Scott PORTA, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR–12–399.**

Court of Appeals of Arkansas.

June 19, 2013.

Mosemarie Dora Boyd, Van Buren and Patrick Nathan Cardamone, for appellant.

Dustin McDaniel, Att'y Gen., by: Karen Virginia Wallace, Ass't Att'y Gen., for appellee.

DAVID M. GLOVER, Judge.

Rodney Porta was tried by a jury and found guilty of the offenses of possession of drug paraphernalia with intent to manufacture methamphetamine and manufacture of methamphetamine. He was sentenced to forty years and a $15,000 fine on the possession conviction and sixty years on the manufacture conviction; the trial court ordered that the sentences be served consecutively for a total of 100 years in the Arkansas Department of Correction. He raises four points of appeal, with several subpoints, all of which involve his competency and his competency evaluation. We reverse and remand for a new trial.

*Background*

Porta does not challenge the sufficiency of the evidence supporting his convictions. Consequently, it is not necessary to discuss at length the facts concerning the offenses themselves. Porta was a passenger in a car that was stopped by a police officer in Van Buren, Arkansas. A portable meth lab was discovered in the trunk of the car. The charges against Porta arose from that incident. He also does not challenge the stop, the arrest, or the search in this appeal.

Prior to trial, Porta's appointed counsel petitioned the trial court to order a mental evaluation of Porta. The trial court ordered the evaluation, which was conducted by Dr. Paul Deyoub. During that examination, Porta made some inculpatory statements that the State sought to introduce as part of its case in chief. A hearing to determine their admissibility was held during the trial, before Dr. Deyoub was allowed to testify about them. At the outset of the hearing, the trial court and counsel discussed the issues surrounding the admissibility of those statements, including whether the statements were privileged, whether they were admissible for any rea-

son other than impeachment, and whether Porta's fifth amendment right against self-incrimination and his sixth amendment right to counsel had been violated. The trial court then heard Dr. Deyoub's testimony concerning his session with Porta.

Dr. Deyoub testified that he was a forensic psychologist, in private practice in Little Rock, Arkansas. He explained that he conducts court-ordered examinations through contracts with the Arkansas State Hospital. He stated that in Porta's case, the indigent examination order went first to the hospital and then it was referred to him. He said that he traveled to Sebastian County on September 15, 2011, to perform the evaluation.

Dr. Deyoub testified that, before talking to a defendant, he follows a certain protocol in these situations, which is described in the evaluation form itself. He said that the purpose of the protocol is to inform the defendant about the voluntary and nonconfidential nature of the examination. Dr. Deyoub indicated the following explanations were given by him to Porta at the beginning of the session: that the evaluation was ordered by the court but that Porta's participation in the evaluation was voluntary; that the information was not confidential; that Porta did not have to make any statements regarding the charges against him but if he did, everything they talked about would be included in the report; and that Dr. Deyoub could be called to testify as to anything Porta told him and any opinions Dr. Deyoub formed as a result of the examination. Dr. Deyoub stated that, in his opinion, Porta understood what he told him; that he understood the purpose of the evaluation; and that there was no problem.

Dr. Deyoub stated that he then read a summary of the charges against Porta and asked him if he wanted to say anything. He said Porta told him that he understood the charges against him but did not want to say anything about what had occurred— that he did not want to make a statement. According to Dr. Deyoub, he did not question Porta after Porta said that he did not want to make a statement, but Porta then voluntarily kept talking and made some inculpatory statements.

Dr. Deyoub explained that immediately after Porta told him he did not want to say anything, he told Dr. Deyoub that he was in the car, not the house; that the items in the trunk of the car were his; and that he had told the other two occupants of the car that he would take responsibility for what was in the trunk. Dr. Deyoub said there was no elaboration beyond those statements.

The forensic evaluation prepared by Dr. Deyoub states in pertinent part:

DISCLOSURE OF THE PURPOSE AND THE VOLUNTARY NON–CONFIDENTIAL NATURE OF THE EXAMINATION:

At the beginning of the examination, Rodney Porta was informed of the nature and purpose of the evaluation and that his participation was voluntary. *He was told the information was not confidential, that a report of the examination would be made to the court, sent to his lawyer, the prosecuting attorney, and that testimony could be required at court proceedings.* I indicated to him he did not have to answer any questions or make any statements about the alleged offenses. He understood the purpose of the evaluation after I explained competency and responsibility.

. . . .

DEFENDANT'S ACCOUNT OF THE OFFENSES:

CR2010–693A

Mr. Porta said he understood the charges against him, but he elected not

to say anything about what occurred. *Still, he made a couple comments that he was in the vehicle, not in the house. He then made another comment that the stuff in the trunk of the vehicle was his, and he told the other two occupants in the vehicle that he would take responsibility for what was in the trunk.* He made those statements after being informed that he did not have to say anything about the charges against him. (Emphasis added.) Dr. Deyoub concluded that "Porta, at the time of the examination, had the capacity to understand the proceedings against him and had the capacity to assist effectively in his own defense." Dr. Deyoub diagnosed Porta with methamphetamine dependence, psychotic disorder NOS, and antisocial personality disorder. He also concluded that, at the time of the alleged conduct, Porta "did not have a mental disease and did not have a mental defect," and "[he] had the capacity for the culpable mental state that is an element of the charged offenses."

On cross-examination, Dr. Deyoub acknowledged that he does not read a rights form or a *Miranda* card to the defendants he examines. Rather, he explains to defendants what competency and responsibility are, he tells defendants that those are the two forensic questions he must address as part of his examination, and he does not advise a defendant that he has the right to legal counsel because it is not part of the protocol.

Additional facts will be discussed as they pertain to the particular points of appeal raised by Porta.

## I.

For his first point of appeal, Porta acknowledges that he did not seek a hearing on his mental capacity, but he contends that the trial court should have ordered one *sua sponte* because reasonable doubt existed as to his competence. A contemporaneous objection is generally required to preserve an issue for appeal, even an issue of constitutional dimensions. *Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003). Citing *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), we explained in *Vilayvanh v. State*, 2012 Ark. App. 561, 2012 WL 4833805, that it is possible, under very rare and extreme circumstances, that a trial court may be obliged to intervene *sua sponte* to correct a serious problem. Once such circumstance occurs when there is a reasonable doubt about the defendant's competency to stand trial, as discussed in *Jacobs v. State*, 294 Ark. 551, 553–54, 744 S.W.2d 728, 729–30 (1988):

The conviction of an accused person while he is legally incompetent violates due process. *Pate v. Robinson*, 383 U.S. 375 [86 S.Ct. 836, 15 L.Ed.2d 815] (1966). *See also* Ark.Code Ann. § 5–2–302 (1987) . . . . . In order to be competent to stand trial a defendant must have the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense. [*Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); . . . ; *Speedy v. Wyrick*, 702 F.2d 723 (1983).] *A trial court should sua sponte order a competency hearing when there is a reasonable doubt about the defendant's competency to stand trial.*

As the Eighth Circuit Court of Appeals explained in [*Speedy* ], . . . :

This court has recently stated *the test for determining whether a trial court should sua sponte order a competency hearing:*

Under this rule of *Pate v. Robinson* . . . *a due process evidentiary hearing is constitutionally compelled at any time that there is "substantial evi-*

dence" that the defendant may be mentally incompetent to stand trial. "Substantial evidence" is a term of art. *"Evidence" encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is "substantial" if it raises a reasonable doubt about the defendant's competency to stand trial.* Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying *Pate's* substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? *Its sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency. At any time that such evidence appears, the trial court sua sponte must order an evidentiary hearing on the competency issue.*

. . . .

Although the Supreme Court has not prescribed exact standards as to the quantum or nature of the evidence necessary to require a competency hearing, the Court *has indicated that consideration of evidence relating to* "a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial" *is appropriate.*

(Emphasis added & citations omitted.)

■ As in *Vilayvanh, supra,* no such circumstances were present in this case. Here, in making his argument that the trial court should have ordered a competency hearing on its own motion, Porta relies primarily upon some letters that he wrote to the judge and courthouse personnel while he was in jail, but after Dr. Deyoub had performed his evaluation. The letters were made part of the case file. They demonstrate a preoccupation with religion, prophesy, God, and other similar things, which Porta contends "presented evidence that [his] ability to competently stand trial had been compromised," and established "reasonable doubt" of his competency to stand trial. We disagree.

Although Dr. Deyoub was not aware of these particular, subsequently written letters as part of his evaluation of Porta's fitness to proceed, Dr. Deyoub made the following assessments: "If [Porta] is redirected from his religious ideation, then his mentation is clear and without any bizarre statements"; "[i]n spite of his religious preoccupation, he has the capacity to testify relevantly, even if he offers irrelevant information about his religious ideation"; and "[t]his defendant is easily brought back to the facts of the case if he is not given any indulgence regarding his religious ideas." There is nothing inconsistent between Porta's letters and Dr. Deyoub's conclusions. Thus, the trial court had before it a forensic evaluation performed by Dr. Deyoub that concluded Porta was competent to stand trial. The forensic evaluation itself recognized Porta's religious ideations but concluded that he could easily be redirected from those ideations and brought to good mentation.

We are convinced that the facts of this case do not satisfy the test for a constitutionally compelled competency hearing because there was not substantial evidence before the trial court that such a hearing was necessary. That is, the evidence before the trial court did not raise a reasonable doubt about Porta's competency to stand trial. *Jacobs, supra.*

## II.

For his second point of appeal, Porta contends that the trial court erred in failing to issue a competency determination. Having concluded that there was no *sua sponte* obligation to order a competency hearing under the facts of this case, this issue had to be properly preserved in order for us to address it. It was not. Consequently, we do not address it.

## III.

For his third point of appeal, Porta contends that the trial court erred in accepting a competency report that was based upon an unconstitutionally conducted psychological evaluation. This exact point was not raised below but portions of it are encompassed within Porta's fourth point of appeal. Therefore, to the extent that these points overlap and are properly before us, they can best be discussed together.

## IV.

Porta's fourth and final point of appeal contends that the trial court erred by admitting, as direct evidence in the State's case in chief, statements he made during Dr. Deyoub's psychological evaluation of him. The point also contains six subpoints. The first five subpoints contend that the trial court erred 1) in finding that counsel received proper notice under *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); 2) in concluding that Porta was not entitled to warnings regarding his right to assistance of counsel; 3) by admitting Porta's statements in violation of his constitutional due-process rights; 4) in finding Porta's statements unprivileged; and 5) in finding Porta's statements constituted spontaneous utterances. The sixth subpoint contends that the trial court's abuse of discretion in admitting the statements rose above the threshold for harmless error and warranted remand for a new trial. We have concluded that there is merit in Porta's third subpoint argument that his constitutional due-process rights were violated with the admission of his statements in this case.

We begin our discussion with Arkansas Code Annotated section 5–2–307 (Repl. 2006), which addresses the admissibility of statements made during a defendant's mental-health examination or treatment:

> Any statement made by a person during an examination or treatment is admissible as evidence only:
>
> (1) To the extent permitted by the Uniform Rules of Evidence; *and*
>
> (2) If the statement is constitutionally admissible.

(Emphasis added.) We first address the second requirement, that the statement be constitutionally admissible, because that is where we find the primary basis for reversing and remanding this case. We recognize that Porta's argument was not developed as fully and completely at trial as it has been in this appeal. His counsel, however, did contend at trial that admission of the incriminating statements would violate Porta's constitutional rights to due process and against self-incrimination. We agree.

We have not found an Arkansas case that addresses this precise issue, and neither Porta nor the State has provided us with one. Therefore, it appears that the issue is one of first impression in our state. However, the issue *has* been addressed by the Eighth Circuit Court of Appeals in *Collins v. Auger*, 577 F.2d 1107, 1109–10 (8th Cir.1978), in the context of a petition for writ of habeas corpus:

> The defendant is entitled to raise his mental condition at the time of the offense as a defense. He is also entitled, under proper circumstances, to an exam-

ination to determine his competency to stand trial. Psychiatric examinations are essential to the proof of his mental condition. An indigent must seek a court order authorizing the examination and the payment of its cost. If the giving of a *Miranda* warning satisfied requirements of the Fifth Amendment and the Fourteenth Amendment and made the defendant's incriminating admissions admissible, the defendant would be placed in a situation where he must sacrifice one Constitutional right to claim another.

If a defendant cooperated with the psychiatrist and made a full disclosure of his thinking processes and his background, including incriminating statements and if he failed to establish his lack of mental capacity, he would be faced with these |₁₁admissions on trial. If a defendant exercised his right to remain silent and refused to cooperate with the psychiatrist the likelihood of a meaningful and reliable examination would be considerably decreased and his opportunity to urge a possible defense thwarted. A defendant should not be compelled to choose between exercising his Fifth Amendment right not to incriminate himself and his due process right to seek out available defenses.

We find the reasoning employed in *Collins* to be compelling and applicable to the issue facing us here. As in *Collins,* Porta's counsel sought a mental examination for Porta to determine his competency to stand trial. Because Porta was indigent, it was necessary to get a court order authorizing the examination and the payment of its cost. Moreover, even though Dr. Deyoub issued several warnings about the non-confidential nature of the session before the examination began, allowing the incriminating statements under the facts of this case placed Porta in a situation that required him to sacrifice one constitutional

right in order to claim another. As the *Collins* court explained, a defendant should not be compelled to choose between exercising his Fifth Amendment right not to incriminate himself and his due process right to seek out available defenses. We agree. Accordingly, we hold that the trial court erred in allowing Dr. Deyoub to testify about the incriminating statements that Porta made during the mental-health examination during the State's case in chief.

In reaching this conclusion, we distinguish two Arkansas cases relied upon by the trial court: *Randleman v. State,* 310 Ark. 411, 837 S.W.2d 449 (1992), and *Hinzman v. State,* 53 Ark.App. 256, 922 S.W.2d 725 (1996). In *Randleman,* our supreme court addressed a similar constitutional situation in which statements made by the defendant |₁₂during his examination were used only for impeachment purposes. The trial court had earlier sustained objections to the admission of the statements during the State's case in chief. Our supreme court concluded that the defendant's Fifth Amendment right against self-incrimination and her Fourteenth Amendment due-process rights had not been violated by the use of the psychiatric forensic report to impeach her testimony. Here, the statements were not used to impeach Porta. He did not even testify.

In the *Hinzman* case, this court was not faced with the constitutional argument raised by either Porta or Randleman. Instead, the pertinent portion of *Hinzman* was decided on the basis of Rule 503(b) of the Arkansas Rules of Evidence. It is therefore distinguishable for purposes of deciding the constitutional infringement of Porta's rights against self-incrimination. As set forth at the outset of our discussion, Arkansas Code Annotated section 5–2–307 has two components, evidentiary and con-

stitutional, and *both* components must be satisfied before statements made during a defendant's mental-health examination or treatment are admissible as evidence. Because we have concluded that Porta's statements were not constitutionally admissible, it is not necessary for us to address the evidentiary component of section 5–2–307, i.e., Arkansas Rule of Evidence 503(b).

Having concluded that admission of the inculpatory statements under the facts of the instant case violated Porta's federal constitutional rights, we must determine whether the error was harmless beyond a reasonable doubt. In *Vann v. State*, 309 Ark. 303, 831 S.W.2d 126 (1992), our supreme court explained that the foundation for the harmless-error rule in cases involving violations of federal constitutional rights is *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and, in deciding what was harmless beyond a reasonable doubt in *Chapman*, the Supreme Court of the United States stated its preference for the approach it had taken in *Fahy v. Connecticut*, where the Court said, "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Vann*, 309 Ark. at 309, 831 S.W.2d at 129 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)).

Here, we are not confident that the due-process error in this case was harmless beyond a reasonable doubt because we cannot say that there is no reasonable possibility that the evidence complained of did not contribute to the verdict. Our conclusion on this point, therefore, requires us to reverse and remand this case for a new trial.

Having reached this conclusion, it is not necessary for us to address the remaining subpoints raised by Porta under his fourth point of appeal because, in light of our decision, they will not arise again upon retrial.

Reversed and remanded.

VAUGHT, J., agrees.

GRUBER, J., concurs.

RITA W. GRUBER, Judge, concurring.

I agree with the majority that the trial court erred by allowing Dr. Deyoub to testify during the State's case-in-chief about the inculpatory statements Porta made to him during the competency examination. I would, however, analyze this error under Porta's fourth and fifth subpoints: that the court erred in failing to find Porta's statements privileged and that the court's abuse of discretion in admitting them rose above the threshold for harmless error.

First, I would find that Porta's statements to Dr. Deyoub were inadmissible because they were used for a purpose other than that of the originally ordered examination. They did not fall within the exception of Arkansas Rule of Evidence 503(d)(2) because they were not introduced for the purpose of determining Porta's mental condition. Nor were they introduced for purposes of impeachment in the guilt phase, as was the situation in *Hinzman v. State*, 53 Ark.App. 256, 922 S.W.2d 725 (1996), and *Randleman v. State*, 310 Ark. 411, 837 S.W.2d 449 (1992). Porta thus had the right to prevent the disclosure of these privileged statements in the guilt phase of his trial.

Second, I am unable to find harmless error in this case. The prosecutor deliberately solicited the inculpatory statements as proof of guilt and then focused in closing arguments on the credibility of Dr. Deyoub, bolstering the testimony of witnesses whose motives the jury might oth-

erwise have questioned more seriously. As recounted in the majority's opinion, Dr. Deyoub testified that Porta said he was in the car when it was stopped, the "stuff" in the trunk was his, and he had told the car's other two occupants that he would take responsibility. These two occupants, who became Porta's codefendants, also testified in the case-in-chief, identifying letters allegedly written to them by Porta. The letters were admitted into evidence through their testimony.

Porta's half-brother testified that he was HIV positive, had mental problems, and was under the influence of his medicines at the time of his testimony. He testified that he had never been arrested prior to this case, that he received three years' probation for conspiracy to possess drug paraphernalia with intent to manufacture methamphetamine, that he did not tell police he had nothing to do with the lab, and that he and Porta had recently become reacquainted after a long estrangement. The letter introduced into evidence through his testimony includes these statements:

> Hey brother what's up yeah I know it sucks. Sorry about all the bullshit. Check this out. I'm tryin' to take all these charges so you and James don't get any prison time.... I wrote my attorney gave him my statement which said you and James was not aware of what was in the trunk ... So brother I also told them I'd testify ... on y'all behalf.... I told you I'd take blame for any trouble and I'll hold to my word.

The letter was handwritten and signed "Scott Porta." The witness testified that he gave the prosecutor the letter only a week before trial.

James Redding testified that he had nothing to do with the meth lab and had been riding in the car only a few blocks before it was pulled over by police. He said that all three of the car's occupants were taken to jail and separated, but he was able to talk to Porta through a cell door and ask him to tell Redding's parole officer that Redding had nothing to do with the incident. Redding testified that Porta agreed to write a statement for the parole officer; that Porta slipped the statement underneath the door within an hour, dated and signed; and that Redding showed it to his parole officer the next morning and later gave it to his attorney. Redding identified a photocopy of the handwritten letter, which reads,

> I Rodney Scott Porta testify that James Redding and Stephen Porta were not aware of my belongings in the trunk of my car in which I was said to have been driving the night of our arrest for the charges placed us again on 12/18/ of '10. Sorry for your inconvenience.

The letter is dated December 27, 2010, and signed "Rodney S. Porta." Redding testified that he stayed in jail and was sent to prison for violating his parole by associating with a known felon. He testified that he pleaded guilty to conspiracy to obtain paraphernalia, and he admitted having numerous charges for theft over the years.

In closing arguments, the prosecutor argued that the State had proved that Porta constructively possessed items in the trunk of the car. The prosecutor specifically referred to the two letters and the testimony of Dr. Deyoub, "who doesn't have a bone in this fight at all" and was not an investigator for the State. The prosecutor further argued,

> He's just there to do a mental exam, and he doesn't care one way or not if he's guilty or not and doesn't care what statements that he makes, if he makes any statements; he just writes them down. And the statements, that Rodney gave Dr. Deyoub, corroborate this, and

corroborate his guilt, his possession of these items.

Defense counsel responded in his closing argument that the State was "trying desperately to scrub clean two terrible witnesses" who had been "trotted out to this court to convict my client." He questioned the ability of the two witnesses—one of whom had been estranged from Porta for years—to identify the handwriting and questioned their motivation in testifying for the State.

Much of the prosecutor's rebuttal argument focused on the two letters and Dr. Deyoub's testimony that Porta said the items in the trunk belonged to him rather than the other two men. These remarks again focused on Dr. Deyoub's credibility:

Dr. Deyoub could care less what he says. He's there to evaluate him; to see if he's—has a mental disease or defect, and if he's competent for court. He doesn't care what—these monumental moments.... He's there just to take down statements, and give his evaluation, and give his opinion as to his competency.

The prosecutor also argued that Porta "corroborated those letters when he talked to Dr. Deyoub and said, I already told the other two, I'm taking responsibility for what's in the trunk of the car 'cause the stuff in the trunk belonged to me." Summarizing the circumstantial evidence of guilt, the prosecutor reminded the jury of "this defendant's own words; Deyoub; and in those letters, that it's mine; the meth lab is mine."

Even when a circuit court errs in admitting evidence, the appellate court will affirm the conviction and deem the error harmless if there is overwhelming evidence of guilt and the error is slight. *Eastin v. State*, 370 Ark. 10, 257 S.W.3d 58 (2007). In the present case, the prosecutor's closing argument focused on Porta's privi-

leged, inculpatory statement to Dr. Deyoub to bolster the credibility of Porta's purported statements in the letters and of the witnesses arrested with him who denied owning the items in the car's trunk. I am unable to conclude that the error in admitting the statements is slight and that other evidence of guilt is overwhelming. I therefore concur in the majority's decision to reverse and remand this case to the trial court.