Cite as 2020 Ark. App. 358

# ARKANSAS COURT OF APPEALS

DIVISION IV

**No**. CR-19-776

| | |
|---|---|
| | **Opinion Delivered**: August 26, 2020 |
| BRIAN KEITH RAYBORN[1] | APPEAL FROM THE LONOKE |
| APPELLANT | COUNTY CIRCUIT COURT |
| | [NO. 43CR-15-634] |
| V. | |
| | HONORABLE SANDY HUCKABEE, |
| | JUDGE |
| STATE OF ARKANSAS | |
| APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Brian Keith Rayborn[1] was convicted in a jury trial of second-degree murder committed against A.B., age one; and second-degree domestic battering committed against E.D., age three. For these offenses, Rayborn was sentenced as a habitual offender to consecutive prison terms of fifty years and twenty years, respectively. Both sentences were enhanced by ten years for the offenses having been committed in the presence of a child, resulting in a total prison sentence of ninety years.

Rayborn now appeals from his convictions, raising two arguments for reversal. First, Rayborn argues that the trial court erred in admitting an out-of-court accusation made by his girlfriend, Ashley Dantzler, which he claims violated his constitutional right to confront

---

[1]Numerous references in the record show appellant's name as "Raybon." However, appellant himself clarified in the proceedings below that the correct spelling of his name is "Rayborn."

witnesses under the Confrontation Clause.  Next, Rayborn contends that trial court erred in admitting statements Rayborn made during his mental evaluation in violation of his right to due process and his right against self-incrimination.  We affirm.

Prior to trial, Rayborn requested an Act 3 mental evaluation to determine his fitness to stand trial.  The trial court granted Rayborn's request.  During the mental evaluation, Rayborn made certain statements bearing on his anger issues and history of domestic violence.  The trial court reviewed the mental evaluation and found Rayborn fit to proceed.

The testimony at trial revealed that Rayborn and his girlfriend, Dantzler, lived together in Lonoke with Dantzler's two sons, A.B. and E.D., and Dantzler's six-month-old daughter, R.D.[2]  On November 29, 2015, at approximately 1:00 a.m., Dantzler called 911 because A.B. was not breathing.  When the police and medical personnel arrived at the house, A.B. was unresponsive.  Despite efforts to revive A.B., he never regained consciousness.  After A.B. was transported to the hospital, his treating physician, Dr. Sherri Carter-Wyatt, pronounced him dead.  According to Dr. Carter-Wyatt's testimony, A.B. had sustained numerous traumatic injuries to his head, and she thought his death was the result of abusive trauma from having been beaten.

Lonoke police officer Cortney Kocourek testified, and she described the scene when she responded to the 911 call that night.  According to Officer Kocourek, when the police arrived, Dantzler was standing on the porch and was screaming unintelligibly.  Rayborn was inside the house lying on the floor, seemingly intoxicated and hysterical.  As the police attempted to revive A.B., Dantzler stated that A.B. was not breathing and that she thought

---

[2]Rayborn is not the children's father.

2

"he was gone." Dantzler told the police that Rayborn had been playing with A.B. in the bed and that she was in the bathroom when Rayborn told her to call an ambulance because A.B. was not breathing. Dantzler stated that she thought A.B. had fallen off the bed. Dantzler told the police that Rayborn meant no harm and would not hurt a child. When Rayborn was asked about A.B., he told the officers that they had been "play wrestling" and that he did not know what caused A.B.'s injuries. The officers arrested Rayborn at the scene.[3]

A couple of hours after A.B. was taken to the hospital, the authorities received another phone call in reference to suspected injuries to another child at the same residence, E.D. Colter Antonsen, who was working as an emergency medical technician that night, testified that his unit returned to the residence and treated E.D. E.D. had numerous injuries and obvious trauma from an unidentified source. E.D. was then transported to the hospital for treatment of his injuries.[4]

Dr. Frank Peretti, a medical examiner, performed an autopsy on A.B. Dr. Peretti testified that A.B. had multiple external and internal injuries throughout his body, including two types of brain hemorrhages. A.B. also had fractured ribs and hemorrhages in his muscle tissue. Dr. Peretti determined that A.B. had died from multiple blunt-force injuries.

---

[3]Dantzler was not arrested at that time. However, she was later arrested and charged with hindering apprehension and endangering the welfare of a minor. As a result of the charges against her, Dantzler invoked her Fifth Amendment right not to testify at Rayborn's trial.

[4]The next day, E.D. and R.D. were taken into emergency custody of the Arkansas Department of Human Services. Ultimately, Dantzler's parental rights were terminated as to both of these children.

Dr. Rachel Clingenpeel, a pediatric physician specializing in child abuse and neglect, testified about her treatment of E.D. at the emergency room. Dr. Clingenpeel stated that E.D. had multiple injuries of varying ages throughout his body "from his head to his toes." She further stated that E.D. had "pattern injuries," reflecting the shapes of the objects that caused them, which is a common characteristic of abuse. Dr. Clingenpeel diagnosed E.D. with physical child abuse.

Officer Randy Mauk was the lead investigator in the case. Officer Mauk testified that, shortly after other officers responded to the 911 call, he was called out to investigate the scene. When Officer Mauk arrived at the house, the medical personnel had already left, and Rayborn was being belligerent and abusive to the officers while they loaded him into the patrol car. Dantzler came outside the house and was talking on the phone. Officer Mauk testified that Dantzler was excited and upset and had some tears in her eyes, and that she was screaming to someone on the phone. Over appellant's hearsay objection, Officer Mauk was permitted to testify that Dantzler told the person on the phone twice that "he killed my baby."[5] The trial court allowed this testimony under the excited-utterance exception to the hearsay rule.

As part of his investigation, Officer Mauk interviewed Dantzler and then Rayborn the following day. During Officer Mauk's interview with Dantzler, Dantzler implicated Rayborn in the death of A.B. Dantzler told Officer Mauk that on the night at issue, Rayborn became angry and was cussing because A.B. would not be quiet; that Rayborn

[5]Officer Mauk indicated that his focus was on processing the crime scene and that he did not speak with Dantzler at that time.

4

threatened to choke and kill the baby; and that she heard loud banging noises when Rayborn slammed A.B.'s head into a door.[6]

Prior to interviewing Rayborn, Officer Mauk read Rayborn his *Miranda* rights. Officer Mauk testified to statements made by Rayborn during the custodial Mirandized interview. Rayborn stated that on the night of A.B.'s death, he was playing with A.B. and "slamming him on the bed and everything." Rayborn stated that while he was playing with A.B. "he went into a cold silence." According to Rayborn's statement, he tried to awaken A.B., but A.B. was not breathing. At that time, Rayborn started doing CPR on A.B. and told Dantzler to call an ambulance. Rayborn denied being angry with A.B. or doing anything to intentionally hurt him. Rayborn also indicated that he had been drinking heavily that night and that he might have blacked out. When asked whether he remembered getting angry and yelling at the child to "stop screaming," Rayborn replied, "I don't know man, anything is possible."

Rayborn testified in his own defense and gave a markedly different account than what he gave in his custodial police interview. Rayborn testified that he had been wrestling with A.B. and E.D. in a playful manner that night. Rayborn stated that after that, he had fallen asleep and that when we awoke, A.B. was on the floor "hollering and crying." According to Rayborn, he asked Dantzler what was wrong with A.B., and they got into an argument. Rayborn testified that during the argument, he asked Dantzler to pack her things

---

[6]Rayborn objected to the admission of these incriminating statements made by Dantzler during her police interview. However, his objection was overruled, and Rayborn does not challenge this ruling on appeal.

5

and take the kids and leave. Then Rayborn changed his mind and decided that he would leave. Rayborn stated that he grabbed his coat and left the house. Rayborn stated that while he was outside the house, he heard pounding three times coming from inside the house. Then Rayborn heard crying, and as he approached the house, he realized it was R.D. who was crying. When Rayborn went back inside the house, he saw A.B. stretched out on the floor making a sound he had never heard a baby make. He also saw E.D. standing there crying. Rayborn testified that he picked A.B. up and laid him on the bed to try to figure out what was wrong with him. He then saw A.B.'s color change to a "dullish blackish gray." Rayborn stated that A.B. stopped breathing and that he could not find a pulse and that he told Dantzler to call 911. Rayborn denied having done anything to hurt the children, and he stated that he had never hurt kids.

On cross-examination, the State sought to question Rayborn about certain statements he had made concerning domestic abuse in his pretrial Act 3 mental evaluation. The State argued that Rayborn had opened the door to the questioning when he testified that he had never hurt kids. Rayborn objected, arguing that "it was not in there"[7] and that the Act 3 report is a confidential report. The trial court overruled the objection, stating that the State could ask Rayborn about the mental evaluation but could not introduce it as an exhibit. The State then asked Rayborn if he remembered saying, during the examination, that he had stopped hitting women in 2008 after his mother admonished him to do so and whether he remembered saying that his anger issues began to return when he started using

[7]"It" was a reference to Rayborn's alleged statement that "he hurt kids."

6

drugs and alcohol in 2009. Rayborn testified that he did not remember making either of these statements but that he might have said them.

At the close of the evidence, the jury returned verdicts finding Rayborn guilty of second-degree murder committed against A.B. and second-degree domestic battering committed against E.D. Now comes Rayborn's appeal.

Rayborn's first argument on appeal concerns the admissibility of Officer Mauk's testimony that he overheard Dantzler twice say "he killed my baby" while she was talking on the phone with someone on the night of A.B.'s death. The trial court overruled Rayborn's objection to this testimony, ruling that it was admissible under the excited-utterance exception to the hearsay rule.[8] Rayborn does not challenge on appeal the trial court's ruling that the out-of-court accusation was an excited utterance under the Arkansas Rules of Evidence. He instead argues that, assuming it was an excited utterance, its admission violated the Confrontation Clause in that Rayborn did not have an opportunity to cross-examine Dantzler about her accusation.

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 400–01 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Rayborn cites *Crawford v. Washington*, 541 U.S. 36 (2004), and *Davis v. Washington*, 547 U.S. 813 (2006), for the proposition that Dantzler's out-of-court accusation that he "killed my baby" was a testimonial statement and should

---

[8]Arkansas Rule of Evidence 803(2) provides that an excited utterance, which is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, is not excluded by the hearsay rule.

have been excluded because he did not have an opportunity to cross-examine the witness about the statement. However, the appellant did not make this argument below.

The Arkansas Supreme Court has repeatedly held that an appellant is limited by the scope and nature of the arguments and objections presented at trial and may not change the grounds for an objection on appeal. *Thomas v. State*, 370 Ark. 70, 257 S.W.3d 92 (2007). Our law is well settled that issues raised for the first time on appeal, even constitutional ones, will not be considered because the trial court never had the opportunity to rule on them. *Id.*

Appellant timely objected to Dantzler's statement that "he killed my baby," arguing that it was hearsay. The trial court overruled the objection, ruling that the excited-utterance exception applied, and the statement was admitted. Importantly, Rayborn did not object to Dantzler's statement or make any argument based on the Confrontation Clause. Accordingly, the trial court never ruled on whether Dantzler's statement that "he killed my baby" violated the Confrontation Clause because Rayborn did not make this argument, and the trial court was not asked to make any such ruling. To preserve a Confrontation Clause argument on appeal, a defendant must obtain a ruling from the trial court. *Bertrand v. State*, 363 Ark. 422, 214 S.W.3d 822 (2005). We conclude that the Confrontation Clause argument Rayborn makes on appeal is not preserved for review because it was not presented below or ruled on by the trial court.

We acknowledge that when Rayborn moved for directed verdict after the State's case, he apparently attempted to raise a Confrontation Clause argument with respect to Dantzler's statement on the phone that "he killed my baby." To this extent, Rayborn stated

8

that during the trial, he made two separate motions to exclude two separate statements and argued that his Confrontation Clause argument "could go to both of those statements." The trial court denied Rayborn's motion for directed verdict and denied the renewal of Rayborn's previous motions, stating that the previous rulings would stand on those previous motions. Appellant's argument came too late because there was no contemporaneous Confrontation Clause objection when Dantzler's "he killed my baby" statement was admitted into evidence. The law is settled that to preserve an issue for appeal, a defendant must object at the first opportunity. *Mezquita v. State*, 354 Ark. 433, 125 S.W.3d 161 (2003). Moreover, assuming arguendo that appellant's motion for directed verdict did encompass a Confrontation Clause argument with respect to Dantzler's "he killed my baby" statement, the Confrontation Clause argument was not ruled on because the trial court stood on its previous rulings, which did not include a Confrontation Clause ruling as to that statement. Because there was no contemporaneous Confrontation Clause objection as to this issue and there was no ruling on the issue, the appellant failed to preserve the issue for appeal.

Rayborn's remaining argument is that the trial court erred in admitting statements he made during his Act 3 mental evaluation—specifically his statements to the examiner that he stopped hitting women in 2008 and that his anger issues returned after he started using drugs and alcohol in 2009. However, this argument is not preserved for review because, again, Rayborn has changed the grounds for his objection on appeal. At trial, Rayborn's only arguments were that these statements were inadmissible because they were not in the

report and that the Act 3 report was confidential.[9]  On appeal, Rayborn has abandoned those arguments and argues that admission of his Act 3 statements violated his constitutional rights to due process and against self-incrimination.  Rayborn cites *Porta v. State*, 2013 Ark. App. 402, 428 S.W.3d 585, and argues that the introduction of the statements impermissibly forced him to choose between his Fifth Amendment right not to incriminate himself and his Fourteenth Amendment due-process right not to be tried if he lacked the competence to assist in his defense.  Because Rayborn has changed the scope of his argument on appeal and this argument was not ruled on by the trial court, it, too, is not preserved for appeal. *See Baker v. State*, 2016 Ark. App. 409.

Affirmed.

WHITEAKER and MURPHY, JJ., agree.

*Terrence Cain*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rachel Kemp*, Senior Ass't Att'y Gen., for appellee.

---

[9]Arkansas Rule of Evidence 503(d)(2) provides that the physician–patient privilege does not apply to court-ordered mental examinations unless the court orders otherwise.